UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AG MIT CMO, LLC, and<br>MIT K, LLC,<br><br>           Plaintiffs,<br><br>-against-<br><br>RBC (BARBADOS) TRADING<br>CORPORATION, and ROYAL BANK OF<br>CANADA,<br><br>           Defendants. | Case No. _____<br><br>**COMPLAINT**<br><br>JURY TRIAL DEMANDED<br><br>TEMPORARY RESTRAINING ORDER<br>AND PRELIMINARY INJUNCTION<br>REQUESTED |

Plaintiffs AG MIT CMO LLC and MIT K, LLC ("Plaintiffs"), by and through their attorneys, Quinn Emanuel Urquhart & Sullivan, LLP, bring this complaint against Defendants RBC (Barbados) Trading Corporation and Royal Bank of Canada ("Defendants"), and allege as follows:

## INTRODUCTION

1. In recent weeks, the markets have tumbled as the world faces the COVID-19 disease—a health pandemic unprecedented in modern history. In response, federal and state governments have started to, and continue to, implement emergency measures to contain COVID-19, including ordering in many instances all non-essential businesses to close down and requiring employees to stay home. As resulting uncertainties related to the U.S. economy rise, mortgage-based assets have gotten caught in the center of the tempest with markets for many such assets shutting down altogether. Government measures to stabilize these markets are starting to be adopted, in recognition that the fundamental economics of the underlying assets are sound, but that liquidity in the markets for these assets has essentially frozen. Nonetheless,

Defendants and other banks have taken advantage of this illiquidity by applying opportunistic (and unfounded) markdowns of these assets in order to trigger widespread margin calls against their counterparties, like Plaintiffs. The banks' margin calls (which, as explained further below, are also unfounded) are bringing mortgage real estate investment trusts ("mREITs")—which finance over $500 billion of U.S. residential and commercial mortgages—to the brink of collapse.

2. Recognizing the aberrant state of the markets, most banks have stopped short of taking precipitous steps that could push the mREIT industry into the abyss. This action is brought to stop one outlier bank—Royal Bank of Canada—that has not stopped short but is instead hitting the accelerator to unlawfully seize and unload a large portfolio of Plaintiffs' assets at fire-sale prices into the seized markets which will have a cascading effect in the market for mortgage-based assets, and potentially the entire U.S. economy. These consequences are likely to undermine the emergent efforts currently being undertaken by federal and state agencies to provide breathing room and help stabilize the economy.

3. Specifically, on March 23, 2020, Defendants issued margin calls to Plaintiffs on the purported basis that the "Market Values" of Plaintiffs' commercial mortgage-backed securities ("CMBS") that are financed through the parties' Master Repurchase Agreements ("MRAs") have drastically declined in value as a result of the current market crisis. According to Defendants, their calculations of these "Market Values" reveal a purported "Margin Deficit" that permits them to require Plaintiffs to post large sums of additional cash or securities to meet margin requirements. Defendants' margin calls, however, are based on their entirely subjective and self-serving calculation of "Market Value," and do not come close to reflecting the fundamental value of the securities or following the contractually-mandated means of assessing

those values.  Indeed, because the "Market" is temporarily frozen, there currently is no objective means of calculating "Market Value."  Moreover, the MRAs provide that "Market Value" shall be based on a "price … obtained from a generally recognized source *agreed to by the parties* or the most recent closing bid quotation from such a source."  MRA ¶ 2(j).  It is entirely unclear what "source" Defendants have been using to calculate "Market Value" in this illiquid market, but it is crystal clear that Plaintiffs have not agreed to use it.

4.     In light of numerous extraordinary circumstances including: (1) the temporary illiquidity in the CMBS market; (2) the fact that Defendants' margin calls are unfounded and do not reflect the true value of the underlying securities; (3) the significant efforts underway by federal and state agencies to return liquidity to the markets; and (4) the fact that margin calls by Defendants and other banks could jeopardize the viability of the entire mREIT industry, Plaintiffs along with other major mREITs have asked Defendants and other banks to forbear from seeking to exercise any purported remedies against mREIT assets covered by the MRAs.  Virtually every major money-center bank has agreed to continue such discussions and hold back from taking action against mREIT assets.  Defendants, in stark and frustrating contrast, refused.

5.     Yesterday, Plaintiffs learned that Defendants intend to conduct an auction that includes nearly $11 million of Plaintiffs' CMBS—*at 11:00 a.m., EDT, this morning*.  Were such a fire-sale auction to proceed, it would not only dramatically and prejudicially underprice these securities to Plaintiffs' detriment, but would also likely precipitate a chain reaction of other banks being pressured to foreclose on other mREITs' pledged securities, all at prices informed by the fire sale that Defendants seek to hold.  Taking a gratuitous wrecking ball to one's counterparties is improper under any circumstance, and particularly here, where the opportunity

for such destruction reflects a national emergency and the contracts at issue expressly prohibit such actions.

6. This opportunistic and unsound behavior amid the most significant public health and economic crisis in a generation—and while government efforts to restore liquidity to the markets are underway—must be stopped. Defendants' actions not only are in clear breach of the parties' contracts and Defendants' duty of good faith and fair dealing, they pose an existential threat to Plaintiffs' and their peers' very existence, and risk undermining government efforts to stabilize the financial markets. Plaintiffs therefore bring this action and simultaneously seek a temporary restraining order and preliminary injunction to enjoin Defendants from conducting today's auction of Plaintiffs' securities or taking any other remedies against Plaintiffs' assets pending compliance with the parties' agreements and current government guidance and regulations designed to stabilize the economy.

## THE PARTIES

7. Plaintiff AG MIT CMO, LLC ("MCMO") is a limited liability company organized under the laws of Delaware and an indirect, wholly owned subsidiary of AG Mortgage Investment Trust, Inc. ("MITT"). MITT is a publicly traded corporation organized under the laws of Maryland with its principal place of business in New York, New York.

8. Plaintiff MIT K, LLC ("MITK") is a limited liability company organized under the laws of Delaware. MITK is a direct, wholly owned subsidiary of MCMO and an indirect, wholly owned subsidiary of MITT.

9. Defendant Royal Bank of Canada ("RBC") is a Canadian chartered bank with its principal offices in Canada.

10. Defendant RBC (Barbados) Trading Bank Corporation ("RBC Barbados") is an investment manager organized under the laws of Barbados with its principal offices in Barbados and the Bahamas. RBC Barbados is an indirect, wholly owned subsidiary of RBC.

## JURISDICTION AND VENUE

11. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

12. RBC has consented to personal jurisdiction and venue in this Court under Section 9 of Annex I to the Master Repurchase Agreement dated as of August 20, 2018 between RBC and MITK.

13. RBC Barbados has consented to personal jurisdiction and venue in this Court under Section 8 of Annex I to the Master Repurchase Agreement dated as of May 2, 2014 between RBC Barbados and MCMO.

14. Venue in this Court also is proper under 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred, and/or a substantial part of the property that is the subject of the action is situated in this District.

## FACTUAL ALLEGATIONS

### A. The Parties Enter The MRAs And Engage In Repo Transactions

15. Plaintiffs are mREITs that originate and invests in a diverse portfolio of real estate loans and mortgage-backed securities, including the CMBS at issue here. Plaintiffs hold loans and securities secured by real property across the country.

16. Mortgage REITs are a critical part of the financial system that provide capital for residential and commercial real estate, including multi-family dwellings. The commercial real estate industry itself employs at least 9.2 million Americans, and together with adjacent sectors

such as construction, retail, hospitality, and real estate services it supports some 63 million jobs.[1] According to Nareit, mortgage REITs have also helped provide mortgage loans for 1.8 million homebuyers.[2]

17. To finance their business operations, Plaintiffs regularly enter into repurchase transactions with financial institutions such as Defendants. A repurchase agreement is a vehicle used for what are effectively short-term loans. The "Seller" (*i.e.*, the effective borrower, and in this case Plaintiffs) sells securities that it owns to the "Buyer" (*i.e.*, the effective lender, here Defendants) with the obligation to repurchase those securities on a fixed date for a pre-determined price with interest payments made along the way. In effect, the securities that Plaintiffs sell and pledge to repurchase serve as collateral for the de facto loans.

18. Like many collateralized commercial loans, a repurchase agreement requires the market value of the securities to be equal to a specified percentage greater than the initial sale price (or the loan amount). Market value is generally determined by looking at the price in the market at which the securities are trading. If the market value of the securities declines below the percentage amount, the Buyer (*i.e.*, the lender) is entitled to make a margin call, which is met by a cash payment or the provision of additional securities. If the Seller (*i.e.*, the borrower) fails to pay the margin call, the purchaser can declare an event of default and sell the securities (in some instances even to itself).

19. Plaintiff MCMO has entered into a number of repurchase transactions with Defendant RBC Barbados. Those transactions are governed by a SIFMA Master Repurchase Agreement dated May 2, 2014 (the "MCMO-RBC Barbados MRA"), which is annexed hereto as

---

[1] https://medium.com/@tombarrackjr/preventing-covid-19-from-infecting-the-commercial-mortgage-market-e7444701745e.
[2] https://www.reit.com/what-reit/types-reits/guide-mortgage-reits.

Exhibit A.  MCMO has also entered into a number of repurchase transactions with Defendant RBC.  Those transactions are governed by a SIFMA Master Repurchase Agreement dated November 7, 2013 (the "MCMO-RBC MRA"), which is annexed hereto as Exhibit B.

20.    Similarly, Plaintiff MITK has entered into a number of repurchase transactions with Defendant RBC.  Those transactions are governed by a SIFMA Master Repurchase Agreement dated August 20, 2018 (the "MITK-RBC MRA," and collectively with the MCMO-RBC Barbados MRA, the "MRAs"), which is annexed hereto as Exhibit C.

21.    The parties have executed more than $3 billion of open repurchase transactions pursuant to these MRAs.  Those transactions are set forth in the schedule annexed hereto as Exhibit D.  In each of those repurchase transactions, Plaintiffs have acted as the Sellers and Defendants have acted as the Buyers.

**B. The COVID-19 Pandemic Dislocates The Markets And The Government Initiates Substantial Stabilization Measures**

22.    Over the last three weeks, the impact of COVID-19 on the economy has wreaked havoc on the equity markets, which declined by approximately 30 percent.  In the past two weeks, amidst market participant concerns about liquidity, the debt markets also became volatile, and prices declined significantly.  The debt market declines, however, did not reflect a decline in the fundamental value of the debt securities as opposed to the absence of liquidity in the marketplace.

23.    This volatility has hit mREITs particularly hard.  By law, mREITs cannot build cash reserves.  They must distribute cash dividends to their shareholders on a monthly basis.  The Defendants knew this when they entered into the MRAs, and they know it still today.  The Defendants also know that demanding additional margin in market-stressed times poses an insurmountable burden on mREITs such as Plaintiffs.

24. At all levels of government, banking authorities have made clear that their overriding concern is that market participants such as Defendants not transform the current temporary disruption in credit markets into a full-blown credit crisis. As has been widely reported, a government rescue plan is imminent. Earlier this morning, the Senate and White House reached an agreement on a historic ***$2 trillion*** economic aid package.

25. With respect to the market for mortgage related securities, like CMBS, the Federal Reserve has taken urgent action to support market value and return market liquidity, while state and federal regulators have urged banks to desist from foreclosing on their clients' assets. It would be short-sighted in the extreme and against urgent public policy for banks to use the COVID-19 pandemic as a pretext to seize Plaintiffs' assets and liquidate them at distressed prices while the government is working overtime to prevent precisely such destabilizing actions.

   **1.    The Federal Reserve**

26. The Bank of Governors Federal Reserve System (the "Federal Reserve") has taken a number of steps to arrest the spiral of forced liquidations of mortgage-backed securities such the ones backing MIT's repurchase transactions.

27. On March 17, 2020, the Federal Reserve established the Primary Dealer Credit Facility (the "Facility") in an effort to support the credit needs of American businesses. The Facility permits primary dealers such as Defendants to pledge a broad range of securities, including highly rated commercial mortgage-backed securities, to the Federal Reserve on terms that match other availabilities at the Federal Reserve discount window, at the Federal Reserve primary credit rate. A copy of the Federal Reserve Board's press release and term sheet are regarding the Facility are annexed hereto as Exhibit E. As a result of the Facility, even though nominal market prices for investment-grade debt have been under stress, primary dealers (such

as Defendants) likely can obtain loans at or close to 100 percent of the securities' par value, reflecting the true value of these assets.

28.     On March 22, 2020, the Federal Reserve, in concert with the Office of the Comptroller of the Currency and the other federal banking agencies, issued an "Interagency Statement on Loan Modification and Reporting for Financial Institutions Working with Customers Affected by the Coronavirus," which recognizes the "temporary" nature of the business disruptions and challenges posed by the national emergency and urges "financial institutions to work prudently with borrowers who are or may be unable to meet their contractual payment obligations because of the effects of COVID-19." The Statement adds that "[t]he agencies view loan modification programs as positive actions that can mitigate adverse effects on borrowers due to COVID-19" and serve "the best interest of institutions, their borrowers, and the economy."[3]  In particular, such modifications will not be automatically categorized as troubled debt restructurings, reflecting the fact that the need to bridge the loan market through the current public health emergency is not reflective of problems with fundamental credit quality.  A copy of the statement in annexed hereto as Exhibit F.

29.     On March 23, 2020, the Federal Reserve announced that it would include CMBS among the $200 billion in agency mortgage-backed securities it plans to purchase as part of its efforts to support smooth market functioning.[4]  A copy of the Federal Reserve's statement is annexed hereto as Exhibit G.

---

[3]  Available at https://www.occ.gov/news-issuances/news-releases/2020/nr-ia-2020-39a.pdf.  The agencies include the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, the National Credit Union Administration, the Office of the Comptroller of the Currency, the Consumer Financial Protection Bureau, and the Conference of State Bank Supervisors.

[4]  https://www.federalreserve.gov/newsevents/pressreleases/monetary20200323a.htm.

30.     The Federal Reserve's interventions all recognize that the challenge facing the markets is to bridge across the disruptions caused by the COVID-19 pandemic and maintain the flow of capital to—not away from—borrowers.  In particular, these actions recognize that temporary market dislocations are not representative of the true value of the securities that Plaintiffs and other borrowers have financed under repurchase transactions.  Instead of permitting these securities and the underlying loans to be liquidated in a system-wide fire sale, these debt obligations should continue to be eligible for purchase at levels reflective of their intrinsic credit quality.

### 2.     New York Governor Cuomo's Executive Order No. 202.9

31.     On March 22, 2020, New York Governor Andrew Cuomo issued Executive Order No. 202.9, "Continuing Temporary Suspension and Modification of Laws Relating to Disaster Emergency," directing all banks subject to the jurisdiction of the State of New York Department of Financial Services, including Defendants, to grant forbearances with respect to any business that has a financial hardship as a result of the COVID-19 pandemic.  The failure to grant such a forbearance is deemed an "unsafe and unsound business practice" under the Banking Law.  A copy of the executive order is annexed hereto as Exhibit H.[5]

32.     By their collective action, New York and federal banking agencies have made clear to banks, including Defendants, that they must work cooperatively with clients affected by the COVID-19 pandemic and that it is the national interest and the interest of the State of New York to do so.  As authorities marshal their resources to prevent banks from foreclosing on their customers and provide liquidity to the market, the only commercially reasonable course of action is to forebear from triggering a vicious cycle of forced liquidations and depressed market values.

---

[5]     Available at https://www.governor.ny.gov/news/no-2029-continuing-temporary-suspension-and-modification-laws-relating-disaster-emergency.

### C. Defendants Seek To Capitalize On The COVID-19 Pandemic By Issuing Unfounded Margin Calls And Liquidating Plaintiffs' CMBS

33.     Notwithstanding the various government actions designed to return liquidity to the markets and stave off mass foreclosures, on March 23, 2020, Defendants made multiple margin calls on Plaintiffs in the total amount of $10,794,000.

34.     Upon receipt of the margin calls, Plaintiffs have asked Defendants and Plaintiffs' other bank counterparties to temporarily forbear from seeking to exercise any remedies against Plaintiffs assets while the various emergency measures stabilize the markets.  Virtually all of Plaintiffs' bank counterparties have—consistent with that request and Governor Cuomo's Executive Order and the federal agencies' Statement—refrained from taking any such steps that could be calamitous to the Plaintiffs and the mREIT market.  Defendants—acting alone—have refused to do so.  Rather, last night, Plaintiffs learned that Defendants intended to auction off over $100 million of Plaintiffs' CMBS this morning without any to Plaintiffs of its intent to do so.

### D. Defendants' Actions Breach The MRAs And The Implied Covenant Of Good Faith And Fair Dealing

35.     Defendants' margin calls, and the imminent auction, are in breach of the MRAs' express provisions and Defendants' implied duty of good faith and fair dealing.

36.     As an initial matter, Section 4(a) of the MRAs generally permits Defendants to issue a margin call to post additional margin in the form of cash or additional securities only if the aggregate "Market Value" of the securities subject to repurchase falls below a certain threshold.  Section 2(j) of the MRAs defines "Market Value" as "the price for such Securities on such date obtained from a generally recognized source *agreed to by the parties* or the most recent closing bid quotation from such a source."  Similarly and further, the MITK-RBC MRA

additionally provides that "[t]he pricing source for calculation of Market Value shall be *as agreed between the parties*, orally or in writing, in relation to any Transaction."

37. Here, Defendants' margin calls are based on "Market Values" that they *unilaterally* determined, apparently based on an artificially (and temporarily) depressed market that is not a reliable or reasonable means of calculating the true value of the underlying securities.  Because Plaintiffs clearly did and do not "agree" that Market Value can be calculated in this manner or that whatever unidentified source Defendants looked to is generally recognized as providing accurate and meaningful pricing for the value of CMBS in this market, the margin calls based on the improperly-calculated Market Values are in breach of the parties' contracts.

38. Defendants' improper March 23, 2020 margin call emails fail to recognize or even address the proper calculation of Market Value.  Instead, within the attached "Valuation Reports," they purport to assign a "Mkt Price" to each Security, without any explanation of the source of such data.  Whatever the source, it is not one that the parties have agreed is "generally recognized" as a valid, accurate, or even reasonable source of market pricing for these Securities today.  Absent this contractually-required joint agreement, Defendants' attempts to unilaterally define the Market Value of the Securities is a breach of contract.

39. Defendants' intended auction of Plaintiffs' securities later this morning is also in breach of the MRAs, for at least two reasons.

40. *First*, Section 11 of the MRAs permits Defendants to sell the securities only after "declar[ing] an Event of Default," which Defendants are permitted to do only if Plaintiffs have defaulted by, *inter* alia, failing to comply with the margin requirements set out in Section 4 of the MRAs.  As explained above, Plaintiffs have complied with the margin requirements, and the only reason that Defendants can claim that Plaintiffs have *not* complied is by relying on

artificially deflated calculations of the "Market Value" of the securities using sources that Plaintiffs do not agree are reliable or generally recognized given the current state of the market. Because the Event of Default that Defendants claim has occurred depends on a Market Value calculation that breached the MRAs, any attempt by Defendants to exercise rights stemming from that breach amounts to a further breach.

41. *Second*, even if Defendants were entitled to calculate their own view of Market Value of the Securities (they are not), and even if they made a proper margin call (they did not), selling the Securities in the manner that Defendants propose would nonetheless breach the MRAs. Even where a nondefaulting party is authorized to sell Securities, it must do so "in a recognized market (or otherwise in a commercially reasonable manner)." MRA § 11(d)(i). As a result of the COVID-19 crisis, there is no "recognized market" for the CMBS Securities at issue. *See, e.g.*, Thomas J. Barrack, *Preventing Covid-19 From Infecting the Commercial Mortgage Market*, Medium (Mar. 22, 2020), *available at* https://medium.com/@tombarrackjr/preventing-covid-19-from-infecting-the-commercial-mortgage-market-e7444701745e ("The market for commercial real estate mortgage loans in the United States stands on the brink of collapse."); Rich Bockmann, *CMBS At A Standstill As Panic Grips Financial Markets*, The Real Deal New York Real Estate News (Mar. 16, 2020), *available at* https://therealdeal.com/2020/03/16/cmbs-at-a-standstill-as-panic-grips-financial-markets/ (quoting a mortgage broker who reports "The CMBS market is shut down"). Defendants' proposed firesale will not occur in a recognized market for the Securities, but instead in a setting that participants, observers, and analysts have all recognized cannot provide a market for such instruments.

42. Nor is Defendants' plan to dump the Securities into a market that is unable to accurately or even reasonably price, buy, or sell them otherwise "commercially reasonable."

Defendants' three-column table of positions, sent to an unknown segment of relevant market participants, apparently less than twenty-four hours before Defendants' plan to hold an auction "via Bloomberg," is not commercially reasonable under any circumstances, and certainly not under the current market emergency, during which participants need more information and time, not less. And Defendants exacerbate these problems by mandating that "[b]ids must be good for 3hrs," a significant period of exposure than many market participants are likely unwilling to endure for this exercise.

43. Defendants' conduct thus constitutes another anticipatory breach of contract by repudiating Defendants' obligations to sell Securities in a recognized market (or otherwise in a commercially reasonable manner) when an Event of Default has been properly declared. Defendants have plainly indicated their intention not to abide by that contractual provision in the parties' MRAs, and therefore their intention to breach those contracts.

44. Separately and independently of their breaches of the MRAs, Defendants breached the implied covenant of good faith and fair dealing that inheres to those contracts by refusing to forbear from exercising remedies they claim to have during these early, indefinite stages of the COVID-19 pandemic. New York law prohibits Defendants' insistence on ignoring temporary and distorted market conditions, countermanding state and federal governmental direction, and depriving Plaintiffs of the fruits of the MRAs in search of windfall profits.

45. Defendants' conduct flies in the face of Governor Cuomo's Executive Order No. 202.9 and its determination that "it shall be deemed an *unsafe and unsound business practice* if, in response to the COVID-19 pandemic, any bank which is subject to the jurisdiction of the [New York State Department of Financial Services] shall not grant a forbearance to any person or business who has a financial hardship as a result of the COVID-19 pandemic."

Notwithstanding the Department's jurisdiction and the Governor's mandate, Defendants have refused to adhere to Governor Cuomo's order.  New York courts (and other courts applying New York law) similarly recognize conduct the executive branch of this state's government has recognized constitutes an unsafe and unsound business practice, cannot be reconciled with all parties' obligations to act in good faith and to deal fairly with counterparties.

## CAUSES OF ACTION

### COUNT I – Breach of Contract
**(Against All Defendants)**

46.	Plaintiffs repeat and incorporate the allegations in paragraphs 1 through 45 as if set forth fully herein.

47.	As described above, valid and binding contracts exist between Plaintiffs and Defendants, *i.e.* the MRAs.

48.	Plaintiffs have timely and fully performed all of the conditions, covenants, and promises required of them under the MRAs.

49.	Defendants breached the MRAs by issuing unfounded margin calls based on artificially depressed "Market Values" that they unilaterally determined using sources with which Plaintiffs did not agree, in violation of Section 2(j) of the MRAs (and Annex I, Section 4 of the MIT K-RBC MRA).

50.	As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered damages in amount to be determined at trial.  Moreover, unless Defendants' conduct is enjoined, an award of damages alone will be insufficient to remedy the irreparable harm that Plaintiffs will suffer as a result of Defendants' breach.

**COUNT II – Anticipatory Breach of Contract**
**(Against All Defendants)**

51. Plaintiffs repeat and incorporate the allegations in paragraphs 1 through 50 as if set forth fully herein.

52. As described above, valid and binding contracts exist between Plaintiffs and Defendants, *i.e.* the MRAs.

53. Plaintiffs have timely and fully performed all of the conditions, covenants, and promises required of them under the MRAs.

54. Defendants have anticipatorily breached the MRAs by pledging to take actions (specifically, to sell securities) that Section 11 of the MRAs expressly limits to situations in which Defendants have properly declared an Event of Default, which Defendants are permitted to do only if Plaintiffs have defaulted by, *inter* alia, failing to comply with the margin requirements set out in Section 4 of the MRAs.  Plaintiffs have complied with the margin requirements, and the only reason that Defendants can claim that Plaintiffs have *not* complied is by relying on artificially deflated calculations of the "Market Value" of the securities using sources that Plaintiffs do not agree are reliable or generally recognized given the current state of the market.  Because the Event of Default that Defendants claim has occurred depends on a Market Value calculation that breached the MRAs, any attempt by Defendants to exercise rights stemming from that breach amounts to a further breach.

55. Defendants' breach of the MRAs by planning to sell the Securities without authority will directly and proximately Plaintiffs to suffer damages in an amount to be determined at trial.  Moreover, unless Defendants' conduct is enjoined, an award of damages alone will be insufficient to remedy the irreparable harm that Plaintiffs will suffer as a result of Defendants' breach.

## COUNT III – Anticipatory Breach of Contract
### (Against All Defendants)

56. Plaintiffs repeat and incorporate the allegations in paragraphs 1 through 55 as if set forth fully herein.

57. As described above, valid and binding contracts exist between Plaintiffs and Defendants, *i.e.* the MRAs.

58. Plaintiffs have timely and fully performed all of the conditions, covenants, and promises required of them under the MRAs.

59. Defendants have anticipatorily breached the MRAs by pledging to sell the Securities in a Bloomberg auction at 11 am on March 26, 2020, in contravention of the Section 11 of the MRAs express requirement that any sales of securities after an Event of Default is declared must be done in a recognized market (or otherwise in a commercially reasonable manner).

60. Defendants' breach of the MRAs by planning to sell the Securities in the absence of a recognized market and not otherwise in a commercially reasonable manner will directly and proximately cause Plaintiffs to suffer damages in an amount to be determined at trial. Moreover, unless Defendants' conduct is enjoined, an award of damages alone will be insufficient to remedy the irreparable harm that Plaintiffs will suffer as a result of Defendants' breach.

## COUNT IV – Breach of the Implied Covenant of Good Faith and Fair Dealing
### (Against All Defendants)

61. Plaintiffs repeat and incorporate the allegations in paragraphs 1 through 60 as if set forth fully herein.

62. There is implied in every contract a covenant of good faith and fair dealing such that no party to such contract may act to deprive the other of the benefits and bargains of the agreement.

63. Defendants have breached this implied covenant by refusing to forbear from exercising contractual remedies they claim to be entitled to exercise. At this time and under these market conditions, margin calls do not have the contractually-intended effect, but instead deprive Plaintiffs of the still-expected fruits of their contracts in favor of windfall profits for Defendants. Government agencies have directed that such actions not be taken and provided support facilities that eliminate any need to take such actions. Nonetheless, Defendants seek to illegitimately exercise a remedy in a manner that would diminish, rather than advance, the parties' purpose in entering into MRAs.

64. By taking these actions, Defendants sought to prevent full performance of the MRAs and to withhold those contracts' benefits from Plaintiffs, and thereby breached the implied covenant of good faith and fair dealing. This breach will directly and proximately cause Plaintiffs to suffer damages in an amount to be determined at trial. Moreover, unless Defendants' conduct is enjoined, an award of damages alone will be insufficient to remedy the irreparable harm that Plaintiffs will suffer as a result of Defendants' breach.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs prays for relief and judgment as follows:

A. An injunction preventing Defendants from conducting today's auction of Plaintiffs' securities or taking any other remedies against Plaintiffs' assets pending compliance with the parties' agreements and current government guidance and regulations designed to stabilize the economy;

  B. an award of direct, consequential and punitive damages; and

  C. such other and further relief as the Court may deem just and proper.

DATED: New York, New York
     March 25, 2020

              QUINN EMANUEL URQUHART &
                SULLIVAN, LLP


              By: /s/ *Jonathan Pickhardt*
                Susheel Kirpalani
                Jonathan Pickhardt
                Rex Lee
                Lindsay Weber

              51 Madison Avenue, 22nd Floor,
              New York, New York  10010-1601
              Telephone:  (212) 849-7000
              Fax:  (212) 849-7100

              *Attorneys for Plaintiffs*